Marshall E. SCHMITT, Terry L. Morgan, and Richard J. Marchewka, on behalf of themselves and other employees similarly situated, Plaintiffs,

v.

The STATE OF KANSAS, Defendant.

Jeffrey L. COLLIER, Robert S. McKinzie, Charles L. Kohler, and Stephen P. O'Rourke, on behalf of themselves and other employees similarly situated, Plaintiffs,

v.

The STATE OF KANSAS, Defendant.

Civ. A. Nos. 91–4213–DES, 91–4215–DES.

United States District Court,
D. Kansas.

Sept. 15, 1994.

Patricia E. Riley, Weathers & Riley, Brad E. Avery, Topeka, KS, for plaintiffs in Civ. A. No. 91–4213–DES.

Carl A. Gallagher, Office of Atty. Gen., Topeka, KS, C. Steven Rarrick, Linda J. Fund, State of Kan., Dept. of Administration–Legal Section, Topeka, KS, Rogers L. Brazier, Jr., Kansas Dept. of Wildlife & Parks, Topeka, KS, for defendant.

Patricia E. Riley, Weathers & Riley, Topeka, KS, for plaintiffs in Civ. A. No. 91–4215–DES.

### MEMORANDUM AND ORDER

SAFFELS, Senior District Judge.

## I.  INTRODUCTION

This matter is before the court following trial without a jury.  Plaintiffs seek compensation for unpaid nonovertime hours.  They do not claim common law breach of contract. Instead, they contend that the State violated the Fair Labor Standards Act ("FLSA").

Although the State prevails in the instant case, the court does not believe the State has treated plaintiffs fairly.  As law enforcement employees, plaintiffs perform a crucial and

often thankless service. Their duties expose them to hazards unfamiliar to other classes of State employees. However, they earn lower effective annualized hourly rates than classes of monthly salaried non-exempt employees who share the same position on the State Pay Plan. The United States Congress has enacted laws under the Fair Labor Standards Act which allow public employers to establish deviated schedules for their law enforcement employees of which the State has taken full advantage. Though the court ultimately finds that the State is within the law, the court is concerned the State's practice sends an unwelcome, albeit unintended, message to a particularly valuable group of State employees.

After carefully considering the record, including the testimony and exhibits offered and admitted at trial, as well as the parties' proposed findings of fact and memoranda and conclusions of law, the court renders the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## II. FINDINGS OF FACT

1. Plaintiffs are past or present full-time classified state law enforcement personnel. During all or part of the period from August of 1988 to the date of trial, the State employed plaintiffs as either Kansas Highway Patrol ("KHP") troopers, sergeants, or pilots; Wildlife and Parks Department ("W & PD") conservation officers; or Kansas Bureau of Investigation ("KBI") special agents I, II, or III.

2. Plaintiffs work thirteen 28–day work periods per year. They work up to 171 nonovertime hours per period and are eligible for overtime pay or compensatory time

credits for hours worked in excess of 171. Unlike their work period, plaintiffs' pay period runs from the 18th day of one month to the 17th day of the following month. They are paid 12 times per year.

3. Troopers, turnpike troopers, KBI agents, and conservation officers receive their monthly rate as long as they work, or otherwise are in pay status, 160 hours per work period. Plaintiffs' leave banks are docked eight hours for each day they are absent.[1] Additionally, their leave banks are subject to reduction for absences of less than a day. Plaintiffs receive the same monthly rate whether they work 160 or 171 hours per work period.

4. The KHP plaintiffs have a negotiated Memorandum of Agreement ("MOA") with the State.[2] Their MOA contains provisions regarding their work schedules and compensation. As to their work schedules, the MOA provides as follows:

WORK SCHEDULE

Within each 28 day work period the standard work day/shift schedule shall be a continuing cycle of six work days of nine consecutive hours each followed by three days off, with one additional scheduled work day during each 28 day work period.

The Patrol and Association recognize and agree certain troopers may be assigned to work day/shift schedules other than the standard and that the responsibilities of the organization and hours actually worked by an individual trooper may necessitate deviations from the standard work day/shift schedule. Such deviations from the standard day/shift schedule may be made, both in days worked and hours in a day, for justifiable organizational needs, or by

---

1. All state employees, including plaintiffs, who work over 160 hours per pay period accrue sick and annual leave at the same rate and receive eight hours of credit when they do not work on a holiday. Additionally, all state employees are subject to disciplinary action, including suspension without pay, for actions unrelated to violations of safety rules of major significance.

2. The Kansas State Troopers Association ("KSTA") is the exclusive representative for the KHP plaintiffs. The KSTA has entered into the following MOA's with the State: (1) the 1986–87 MOA; (2) the 1988–89 MOA; and (3) the 1991–

93 MOA. The 1986–87 MOA was in effect from October 1, 1986 to July 1, 1987. It was renewed and effective through December 1, 1988. The 1988–89 MOA was in effect from December 1, 1988, to July 1, 1989. It was renewed through January 1, 1992. The 1991–93 MOA was in effect from January 1, 1992, to July 1, 1993. Article XXIII of the 1991–93 MOA provides that "[t]he entire agreement shall be automatically renewed from year to year [following July 1, 1993] unless either party shall notify the other by writing...."

mutual agreement between the affected trooper and the appropriate supervisor, or due to extra hours worked during any given 28 day work period.

As to their compensation, the MOA provides as follows:

SALARIES

The Kansas Highway Patrol shall pay all troopers in the appropriate unit in accordance with the approved state pay plan.

5. Sergeants, road troopers, and pilots are scheduled to work nine hours per day on a rotating schedule of six days on, three days off; six days on, three days off; six days on, three days off; with one additional day on per 28–day period. Thus, sergeants, road troopers, and pilots average 171 hours per work period and 185 hours per pay period.

6. The Kansas Turnpike Authority contracted with the KHP to provide troopers for the turnpike. Turnpike troopers are scheduled to work a minimum of eight and one-half and a maximum of nine hours per day on a rotating schedule of six days on, three days off; six days on, three days off; six days on, three days off; with one additional day on per 28–day period. Thus, turnpike troopers average a minimum of 161.5 hours and a maximum of 171 hours per work period and a minimum of 175 hours and a maximum of 185 hours per pay period. Turnpike troopers receive the same salary as other troopers on the same range and step of the State Pay Plan.

7. Some troopers work as court liaison officers. They are scheduled to work 160 hours per period. They receive the same salary as other troopers on the same range and step of the State Pay Plan.

8. Pregnant troopers who are placed on light duty are scheduled to work 40 hours per week. These troopers are not partially exempt under 29 U.S.C. § 207(k).

9. The KBI plaintiffs' regular schedule consists of 40 hours per week and 160 hours per 28–day work period, but their schedules may vary by supervisor. Due to the nature of their work, they often work irregular schedules. When necessary, they work 171 hours per period. Some regularly work 171 hours per period.

10. The W & PD plaintiffs generally set their own schedules. Their schedules often vary from region to region and sometimes even within the same region. Nevertheless, their normal work period consists of 160 hours per 28–day period. The W & PD sets aside the 11 hours between 160 and 171 as "buffer time." These 11 hours are reserved so that conservation officers have nonovertime hours available to respond to emergencies and "call-outs."

11. Neither the KBI nor W & PD plaintiffs have a MOA with the State. The terms of their employment may be found in the applicable State statutes and administrative regulations. Like the KHP plaintiffs, they are paid according to their placement on the State Pay Plan.

12. The State Pay Plan is a series of matrices containing information regarding rates of pay. It is prepared by the Director of the Department of Personnel Services ("DPS") after consultation with the Director of the Budget and Secretary of Administration. Once prepared, the Director submits the Pay Plan to the Governor for approval. If approved, the Pay Plan becomes effective upon the Legislature's appropriation of funds.

13. State employees are assigned different positions on the Pay Plan. If an employee is a member of the classified service, his or her position on the matrix is determined by the DPS. All plaintiffs are members of the classified service. Before it places classified employees on the matrix, the DPS designates classes and categorizes jobs according to class. After examining a particular job, the DPS assigns it to a specific class composed of other jobs with similar duties and responsibilities. A job's duties and responsibilities determine its class placement. The DPS's goal is to assign like jobs to the same class.

14. Once classes have been designated and jobs assigned, each class has to be placed on the pay matrix. Exempt, partially exempt, and non-exempt employees all are placed on the matrix. As part of the placement process, the DPS conducts salary surveys for each class. The DPS uses the sur-

veys to investigate the salaries of jobs with the same duties and responsibilities. The surveys identify the monthly salaries which employers pay for comparable jobs. It is not standard "industry" practice to inquire as to hours worked. In keeping with "industry" practice, the DPS's surveys do not inquire as to hours worked. Based in part on the data obtained in the surveys, the Director assigns each class to a monthly salary position on the matrix. The Director then recommends these assignments to the Governor. The assignments become effective upon the Governor's approval.

15. The standard workweek for non-exempt classified employees is 40 hours. The State's agencies sometimes designate deviations from the standard workweek for a particular class of employees. The State designated deviations for all plaintiffs.[3] Under their deviated schedules, plaintiffs work up to 171 nonovertime hours per 28–day work period. When the DPS assigned plaintiffs to positions on the matrix, it was aware plaintiffs worked non-standard schedules.

16. Although required to prepare and publish only monthly and hourly rate schedules, the Director routinely prepares and publishes the following four schedules: (1) annual; (2) monthly; (3) hourly; (4) and overtime. The annual and hourly rates are derived from the monthly rate. For example, when determining the hourly rate earned by a non-exempt employee working a standard schedule, the State multiplies the monthly rate by 12 and divides the product by 2080 (52 weeks multiplied by 40 hours/week).[4] The monthly rates are not calculated by multiplying an hourly rate by the number of non-overtime hours worked.

17. All plaintiffs receive a base monthly rate. As full-time classified employees, they are not paid on an hourly basis. The rates listed in the hourly schedule are used to calculate nonovertime pay only for special appointments and temporary, emergency, and intermittent employees.

18. When the State hired or promoted plaintiffs, plaintiffs executed appointment records or employee data sheets signed both by the individual plaintiff and his or her appointing authority. These records and sheets clearly indicate that plaintiffs are paid at the monthly rate. Additionally, the position announcements and advertisements for plaintiffs' positions do not show an hourly rate. Instead, they list only the pertinent monthly and annual salaries. During their interviews, and in their orientation meetings, the pay rates which the State presented to plaintiffs were the monthly rates. Plaintiffs' base monthly rates do not vary from month to month even though they work a varying number of nonovertime hours from pay period to pay period. However, their base monthly pay rates do vary when plaintiffs

---

3. Each class of plaintiffs made three different stipulations regarding their deviated schedules. In paragraphs a) and b) of the Pretrial Order, the plaintiffs stipulated generally as follows:
   a. Plaintiffs are present or past full time classified State employees employed in law enforcement positions which are partially exempt under 29 U.S.C. § 207(k) of the FLSA.
   b. No overtime is due for the plaintiffs until 171 hours in a 28 day work period has been exceeded.
   Each class of plaintiffs later stipulated that the State had designated a deviation as to their particular class. In paragraphs f), g), and h) of the Pretrial Order, plaintiffs stipulated specifically as follows:
   f. Defendant has designated a deviation from the standard 40 hours work week for all plaintiffs in the Kansas Highway Patrol, establishing their work period as 171 hours in a 28 day work period.
   g. Defendant has designated a deviation from the standard 40 hours work week for all plain-

tiffs in the Kansas Bureau of Investigation, establishing their work period as 171 hours in a 28 day work period.
   h. Defendant has designated a deviation from the standard 40 hours work week for all plaintiffs in the Wildlife and Parks Department, establishing their work period as 171 hours in a 28 day work period.
   Plaintiffs argue that their stipulations do not establish that the State has designated deviations in accordance with the relevant law or for the relevant period. The court finds these arguments to be without merit. Plaintiffs clearly and specifically stipulated without qualification that the State designated the relevant deviations. However, the court notes that absent the W & PD plaintiffs' stipulation there is no evidence that the agency head for the W & PD filed a deviation for the W & PD plaintiffs before October 30, 1991.

4. There is no hourly rate schedule other than that contained in the Pay Plan.

earn, in addition to their salaries, overtime, shift differential, or holiday pay or have their rates reduced for leave without pay.

19. The FLSA became applicable to the State on April 16, 1986. The State did not alter the amount of plaintiffs' monthly rates, but did decrease their maximum-hours threshold for overtime compensation. Thus, their monthly rates remained the same but their nonovertime ceiling was reduced. For instance, prior to the application of the FLSA, the KBI and W & PD plaintiffs were ineligible for overtime until they had worked 258 hours per month and 216 hours per 28–day period, respectively. Additionally, prior to the application of the FLSA, the KHP troopers were ineligible for overtime. However, following the application of the FLSA, the troopers' work schedules were reduced and they became eligible for overtime for the first time.

20. Dr. Norman Hanson was the Director of DPS from late 1978 to June 1985. During his tenure, he and other top DPS administrators regularly met with agency heads and personnel officers. Dr. Hanson never instructed agency heads or personnel officers to withhold the hourly schedule from classified employees. In fact, during his tenure, the DPS established personnel offices within each agency which had copies of the Pay Plan and which made them available to any employee who wished to peruse the Plan.[5]

21. Dr. Hanson testified that if an employee is paid at a monthly, as opposed to an hourly, rate, the hourly pay matrix does not apply to that employee "from the standpoint of remuneration." That is, a monthly employee's nonovertime compensation is not derived from the hourly rate schedule. The hourly schedule applies only after the employee crosses the overtime threshold.[6]

Nancy Echols, the current Director of the DPS, further explained that the hourly matrix does not establish a monthly employee's nonovertime compensation. She testified that the hourly schedule does not accurately reflect the annualized hourly rate for all classified employees. Because law enforcement employees work more nonovertime hours per pay period, their annualized hourly rate is lower than that paid to employees working a standard 40 hour workweek. She also explained that the DPS has not published hourly schedules for monthly salaried employees who work deviated schedules, such as plaintiffs. Bill McGlasson, the current Assistant Director of the DPS, also testified that full-time classified employees earn monthly salaries and are not paid at the hourly rate listed in the schedule.[7]

22. The DPS assigned plaintiffs' classes to monthly rates on the Pay Plan based upon market surveys of the surrounding central states and local law enforcement employers. It based its assignment decisions on the monthly rates paid to surveyed employees with similar job duties and responsibilities. It did not base its assignment decisions on the number of nonovertime hours plaintiffs worked. However, the DPS was aware that plaintiffs were subject to deviated nonovertime schedules.

23. The Governor later approved plaintiffs' assignments by Executive Directive. Except for the master troopers' class, plaintiffs' current assignments became effective in July of 1989 during the implementation of Phase III of the Comprehensive Classification and Job Rate Study. The master troopers' current class assignment became effective June 18, 1992.

24. Plaintiffs are paid 12 times a year at the monthly rate corresponding to their

---

5. Some plaintiffs saw the hourly rate schedule and believed it applied to them. That is, they thought they were hourly employees. Some plaintiffs saw the hourly schedule and believed it reflected their "regular rate."

6. Several times during his testimony Dr. Hanson indicated, when discussing the hourly schedule, that since there could be deviated work schedules there also could be different hourly "salaries."

7. In addition to Dr. Hanson, Mrs. Echols, and Mr. McGlasson, the following former and current DPS employees testified at trial: (1) Cliff Doel; (2) Janice Magathan; and (3) Ken Otte. As did Dr. Hanson, Mrs. Echols, and Mr. McGlasson, each explained that full-time classified employees are paid on a monthly, not hourly, basis. Each also explained that the hourly schedule is not used to calculate full-time classified employees' nonovertime compensation.

range and step on the Pay Plan. When plaintiffs work overtime, they receive a base rate from the overtime schedule. This overtime rate is derived from an hourly rate found on the hourly schedule. As previously noted, the hourly rate is derived from the monthly rate using a formula which does not account for plaintiffs' deviated schedules.[8] As a result, the State pays plaintiffs a base overtime rate derived from an hourly figure which exceeds their actual annualized base hourly rate.[9]

25. Administrative convenience originally motivated the DPS's decision to calculate plaintiffs' overtime from the previously prepared and published overtime schedule. However, the KIPPS system, the State's computerized payroll system, currently has the capacity to calculate the regular rate of pay for each work period in a pay period.

26. During his tenure as Director, Dr. Hanson received an inquiry dated April 30, 1985, from Dr. Richard Mann, Chief of Administration at the University of Kansas, Lawrence campus, as to "whether the current salary paid to law enforcement officers is to be paid on the basis of a 43 hour work week with overtime paid above 43 hours, or whether a straight hourly rate must also be paid for the hours between 40 and 43 hours." Dr. Hanson believed that Dr. Mann asked for an interpretation applicable to law enforcement agencies with deviated work schedules of 171 nonovertime hours per 28-day period.

27. Dr. Hanson responded to Dr. Mann's inquiry with a letter dated May 23, 1985. Cliff Doel, a staff member in the Classification and Pay section of the DPS, researched the question presented by Dr. Mann and prepared the response for Dr. Hanson's signature. During his tenure as Director, Dr. Hanson conducted weekly staff meetings at which DPS policies and interpretations were discussed with and among the DPS section chiefs before the DPS sent out any document

stating policy or providing an interpretation. Before sending a letter expressing the DPS's opinion, Dr. Hanson's normal practice was to discuss the question and opinion with the DPS section heads, as well as the legal section, and have them initial a file copy of the final opinion. Dr. Mann's inquiry was of the sort that would have been discussed at the weekly staff meetings. However, Dr. Hanson does not remember with whom he discussed the May 23, 1985, response to Dr. Mann's inquiry.

28. The May 23, 1985, response provides, in pertinent part, as follows:

We have received your memorandum of April 30, 1985 in which you request an interpretation of the Fair Labor Standards Act regarding whether the current salary paid to law enforcement personnel is to be paid on the basis of the maximum hour standard, or whether a straight hourly rate must be paid between the standard workweek and the maximum hour standard.

It is our interpretation that, whether an employee is paid on a monthly or hourly basis, all non-exempt employees are entitled to a straight rate of pay until in excess of the appropriate maximum hour standard. The law requires monthly rates for non-exempt personnel be reduced to their workweek equivalent (29 C.F.R. 778.113).

In accordance with K.A.R. 1–5–21 and 1–9–1, the *Civil Service Salary Ranges* book provides monthly and hourly rates based on a regular 40 hours of work per week. To maintain internal classification equity, all law enforcement and fire prevention designated employees (29 C.F.R. 533) paid according to the published monthly or hourly rates should, therefore, receive a straight hourly rate for all hours in excess of the standard 40 hours until subject to a maximum hour standard, regardless of the work period elected.

---

8. Nonexempt state employees on standard schedules work 2,080 nonovertime hours per year. Plaintiffs work thirteen 28 day work periods of 171 nonovertime hours each, or 2,223 nonovertime hours per year. The hourly schedule is created by multiplying the monthly rate by 12 and dividing the product by 2080 (52 weeks multiplied by 40 hours/week).

9. In order to find plaintiffs' true base hourly rate, one would have to multiply their monthly rates by 12 and divide the product by 2,223 (13 work periods multiplied by 171 hours/period).

29. Subsequently, Thomas Kelly, the Director of the KBI, sent a letter to Dr. Hanson in which he questioned whether agencies were required to pay at an hourly rate for hours between 160 and 171 and requested a deviation under K.A.R. 1–9–1 to avoid the burden of paying at an hourly rate for these 11 hours.[10]

30. Dr. Hanson left the DPS on approximately June 18, 1985. After his departure, Nancy Echols became the Acting Director. She served as Acting Director until Susan Irza was appointed Director on August 18, 1985. When Susan Irza left the DPS on April 1, 1991, Nancy Echols was appointed Director. She is the current Director.

31. On June 24, 1985, David Lewin, Director of Personnel Services for the University of Kansas, wrote to Nancy Echols, then Acting Director of the DPS, to apprise her of his intention to pay Lawrence campus law enforcement personnel no more than their monthly salary for nonovertime hours between 40 and 43 per workweek.

32. On June 27, 1985, Acting Director Echols wrote to Director Kelly to inform him of her receipt of his June 13, 1985, letter. She also informed him that proposed K.A.R. 1–5–21(b) had been withdrawn and as a result law enforcement employees still could be paid a monthly salary.[11] She further promised a follow-up memorandum "in the coming week" which would "clarify the impact of 1–9–1."

33. A letter dated July 15, 1985, from Acting Director Echols [12] to Director Lewin clarified the opinion expressed by Dr. Hanson in his May 23, 1985, response to Dr. Mann. Cliff Doel drafted the July 15, 1985, letter to Director Lewin. Adele Ross–Vine, an attorney with the legal section of the Department of Administration, assisted Mr. Doel.[13] In pertinent part, the July 15, 1985, letter provides as follows:

In regard to the method of payment for hours of work between 40 and 43, a May 23, 1985 letter from the Division to Dr. Richard Mann indicated that, pursuant to K.A.R. 1–5–21 and 1–9–1, all employees paid according to the monthly rate should receive the straight hourly rate for all hours in excess of the standard 40 hours until subject to a maximum hours standard. That statement should be clarified to point out that K.A.R. 1–9–1 allows for a deviation to the standard 40–hour workweek, in which case the monthly salary rate covers the specified hours. Because you have indicated that your are establishing a deviation from the standard 40–hour workweek in which salaries for law enforcement and fire prevention personnel at the University of Kansas would cover all

10. In his letter, Director Kelly pointed out that KBI agents never had been on a 40–hour work week and when they worked less than 171 hours in a period they still were paid a full salary. He also discussed the heavy financial impact posed by the application of the FLSA and indicated that the current interpretation could result in reduced services. Specifically, he wrote as follows:
... straight time pay between 160–171 hours, if required, would be a heavy blow to the bureau following the severe and sudden impact of *Garcia.* To avoid the imposition of the straight time pay, I hereby request, pursuant to K.A.R. 1–9–1, "a deviation from the standard work week." I would ask that the bureau be allowed to implement a 28 day work period based upon the express provisions of 29 U.S.C. § 207(d) [sic]. The bureau, under this request, would pay the standard monthly salary to each agent, unless an agent worked more than 171 hours in a 28 day work period.

11. The following change to K.A.R. 1–5–21 had been proposed and withdrawn:
**1–5–21. Monthly or hourly rates.** *(a) Except as provided in subsection (b), all* employees shall be paid on either a monthly or hourly salary basis at the option of the appointing authority. Calculation of hourly wage rates shall be determined for each monthly rate by applying the following formula:

$$\frac{\text{Monthly rate} \times 12}{52 \times 40 \text{ hours/week}}$$

*(b) Non-exempt employees engaged in law enforcement and fire prevention activities as defined in 29 C.F.R. 553 shall be paid on an hourly salary.*

12. With full authority, Bill McGlasson, current Assistant Director of the DPS, signed Acting Director Echols name to the July 15, 1985, letter ("the clarification letter") while she was out of town. Nancy Echols testified that she agreed with the opinion that went out over her name. In fact, she since has reaffirmed it several times.

13. In providing assistance, she relied, in part, on K.S.A. 75–5505(a), K.A.R. 1–5–21, and K.A.R. 1–9–1.

hours of work up to 43 hours per week, no additional straight time would be required between 40 and 43 hours.

34. At the time the clarification letter was written and sent out, Congress had not yet enacted the Fair Labor Standards Amendments of 1985.

35. Since the "clarification letter," the State consistently has reaffirmed its position that law enforcement employees' monthly salaries cover all nonovertime hours per period. For instance, as late as July 1, 1991, the State explained in a letter from Nancy Echols to Colonel Bert Cantwell, Superintendent of the Kansas Highway Patrol, that "[t]he salary rate that is set for Troopers is intended to cover all the hours that Troopers are scheduled to work."

## III. CONCLUSIONS OF LAW

1. The court has jurisdiction over the instant action pursuant to 28 U.S.C. § 1331. Venue is proper in this district.

2. The FLSA was enacted in 1938. Congress's stated purpose in enacting the FLSA was to eradicate from interstate commerce labor conditions detrimental to the maintenance of the minimum standard of living necessary for the health, efficiency, and general well-being of workers. 29 U.S.C. § 202(a). In its present form, the FLSA establishes minimum wage, overtime pay, child labor, and equal pay requirements.

3. Prior to 1974, the FLSA did not apply to state governments. Congress extended the FLSA to cover state employees with the FLSA Amendments of 1974. FLSA Amendments of 1974, 29 U.S.C. § 203(d) and (x). *See also Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 533, 105 S.Ct. 1005, 1008, 83 L.Ed.2d 1016 (1985); *Lamon v. City of Shawnee, Kan.,* 972 F.2d 1145, 1149 (10th

Cir.1992). In *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Supreme Court addressed the constitutionality of the 1974 Amendments. The Court held that Congress could not extend the FLSA under the Commerce Clause "to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions." *National League of Cities v. Usery,* 426 U.S. 833, 852, 96 S.Ct. 2465, 2474, 49 L.Ed.2d 245 (1976). The Court cited the ability to structure employer-employee relationships in areas such as police protection and parks and recreation as an example of a function "well within the area of traditional operations of state ... governments." *Id.* at 851 & n. 16, 96 S.Ct. at 2474 & n. 16.

4. In 1985, in *Garcia v. San Antonio Metropolitan Transit Authority,* the Court revisited the question presented in *Usery.* 469 U.S. 528, 105 S.Ct. 1005. In a 5–4 decision, the Court overturned *Usery* and the FLSA again applied to the states. *Id.* at 556–57, 105 S.Ct. at 1020–21. However, "[b]ecause of the difficulty posed to state and local employers by the sudden resurrection of the Act, Congress delayed until April 15, 1986 the Act's application to state and local governments." *Lamon,* 972 F.2d at 1150 (citing the Fair Labor Standards Amendments of 1985, Pub.L. No. 99–150 (1985)).[14]

5. The FLSA often is described as a minimum-wage, maximum-hours law. Indeed, in *Lamon v. City of Shawnee, Kan.,* the Tenth Circuit wrote that "[t]he backbone provisions of FLSA are its minimum wage and overtime requirements." *Id.* The overtime pay requirement is set forth at 29 U.S.C. § 207(a)(1).[15] Section 207(a)(1) provides as follows:

**14.** "The immediate impact of the *Garcia* decision was to bring approximately 13.8 million state and local employees under FLSA coverage of which about 7.5 million were subject to the minimum wage and 6.9 million were subject to overtime compensation." 52 Fed.Reg. 2012, 2026 (1987). The Department of Labor estimated the annual costs to be $733 million to comply with the overtime provisions and $396 million to comply with the minimum wage requirements. *Id.* at 2027.

**15.** In *Walling v. Helmerich and Payne, Inc.,* 323 U.S. 37, 40, 65 S.Ct. 11, 13, 89 L.Ed. 29 (1944), the Supreme Court explained that "the Congressional purpose in enacting § 7(a) was twofold: (1) to spread employment by placing financial pressure on the employer through the overtime requirement, [citation omitted]; and (2) to compensate employees for the burden of a workweek in excess of the hours fixed in the Act."

Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

Hence, the general rule under the FLSA is that an employer must compensate an employee at a rate not less than one and one-half times the employee's regular rate for all hours worked above 40 in a given workweek. 29 U.S.C. § 207(a)(1). An employer must pay overtime even if the employee works no hours at all the following workweek. *Avery v. City of Talladega, Ala.*, 24 F.3d 1337, 1345 (11th Cir.1994).

▮ 6. Although § 207(a)(1) sets forth the general rule regarding maximum-hours and overtime pay, states are allowed to employ law enforcement personnel under the terms set forth in § 207(k). Section 207(k) enables states to deviate from the standard 40–hour workweek and establish an alternative maximum-hours threshold for law enforcement personnel. Section 207(k) provides, in pertinent part, as follows:

No public agency shall be deemed to have violated subsection (a) of this section with respect to the employment . . . of any employee in law enforcement activities . . . if—

(1) in a work period of 28 consecutive days the employee receives for tours of duty which in the aggregate exceed the lesser of (A) 216 hours, or (B) the average number of hours (as determined by the Secretary pursuant to section 6(c)(3) of the Fair Labor Standards Amendments of 1974) in tours of duty of employees engaged in such activities in work periods of 28 consecutive days in calendar year 1975; . . .

compensation at a rate not less than one and one-half times the regular rate at which he is employed.

The Secretary of Labor has determined that a law enforcement employee may work 171 hours in a 28–day work period before a state must pay overtime under the FLSA. 29 C.F.R. § 553.230. Therefore, section 207(k) allows the State to pay its law enforcement employees at their regular rate for the first 171 hours in a 28–day work period, but requires the State to pay them at their overtime rate for hours in excess of 171. *Lamon,* 972 F.2d at 1150.

7. In the instant case, plaintiffs make the following three claims: (1) that throughout their employment the State has not paid them for hours worked between 160 and 171 per 28–day work period; (2) that those plaintiffs who received shift differential were wrongfully denied appropriate overtime pay; and (3) that those plaintiffs who received longevity pay were wrongfully denied appropriate overtime pay. The court granted plaintiffs summary judgment as to their second and third claims leaving for trial only plaintiffs' first claim.

8. On their remaining claim, plaintiffs seek compensation at their regular rate for every hour worked between 160 and 171 in any 28–day work period. They refer to the hours between 160 and 171 as unpaid straight time. Their straight time claim has two distinct parts: (1) a claim for unpaid straight time for periods in which plaintiffs also worked overtime; and (2) a claim for unpaid straight time for periods in which plaintiffs worked no overtime.

▮ 9. The Department of Labor has promulgated various regulations interpreting the FLSA. The administrative regulations adopted pursuant to the FLSA are entitled to great weight and the court may properly resort to them for guidance. *Lamon v. City of Shawnee, Kan.,* 972 F.2d 1145, 1151 n. 7 (10th Cir.1992). *See also Chevron, U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 842–845, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984) (discussing deference to be given an administrative agency's construction of the statute which it administers and noting, on page 844, 104 S.Ct. page 2782, that "[w]e have long recognized that considerable weight should be accorded to an executive

department's construction of a statutory scheme it is entrusted to administer"); *Mitchell v. Greinetz*, 235 F.2d 621, 625 (10th Cir.1956) (stating, in a case under the FLSA, that administrative "regulations and interpretations are entitled to great weight and should not be lightly set aside").

10. Subpart D of Part 778 of Title 29 of the Code of Federal Regulations addresses special problems related to overtime compensation under the FLSA. 29 C.F.R. 778.300–33. The seventh subheading within subpart D addresses the effect of an employer's failure to count or pay for certain working hours. 29 C.F.R. 778.315–18. Sections 778.315 and 317 are particularly pertinent to the first part of plaintiffs' straight time claim.

11. Section 778.315 explains that the FLSA requires an employer to pay for all nonovertime hours an employee works in a period in which the employee also works overtime. Specifically, § 778.315 provides as follows:

> In determining the number of hours for which overtime compensation is due, all hours worked (see § 778.223) by an employee for an employer in a particular workweek must be counted. Overtime compensation, at a rate not less than one and one-half times the regular rate of pay, must be paid for each hour worked in the workweek in excess of the applicable maximum hours standard. This extra compensation for the excess hours of overtime work under the Act cannot be said to have been paid to an employee *unless all the straight time compensation due him for the nonovertime hours under his contract (express or implied) or under any applicable statute has been paid.*

(Emphasis added).[16]

12. Section 778.317 discusses the legality of agreements not to pay for certain nonovertime hours. Specifically, § 778.317 provides, in pertinent part, as follows:

> An agreement not to compensate employees for certain nonovertime hours [violates the FLSA] since it would have the ... effect of diminishing the employee's total overtime compensation. An agreement,

for example, to pay an employee whose maximum hours standard for the particular workweek is 40 hours, $5 an hour for the first 35 hours, nothing for the hours between 35 and 40 and $7.50 an hour for the hours in excess of 40 would not meet the overtime requirements of the Act. *Under the principles set forth in § 778.315, the employee would have to be paid $25 for the 5 hours worked between 35 and 40 before any sums ostensibly paid for overtime could be credited toward overtime compensation due under the Act. Unless the employee is first paid $5 for each nonovertime hour worked, the $7.50 per hour payment purportedly for overtime hours is not in fact an overtime payment.*

(Emphasis added).

13. Read together, §§ 778.315 and 317 establish the principle that, in order to comply with the overtime requirements of the FLSA, an employer must pay at the regular rate for all nonovertime hours worked in a period in which the employee also worked overtime. *See Reich v. Midwest Body Corp.*, 843 F.Supp. 1249, 1251–52 (N.D.Ill.1994) (stating that "[o]vertime pay, as required by the FLSA, has not been paid unless both straight time pay and overtime pay have been fully paid and have been paid based on an employee's regular rate"). *Cf. Donovan v. Crisostomo*, 689 F.2d 869, 876 & n. 13 (9th Cir.1982) (requiring employer to return kickbacks of straight time pay that the employer extracted from employees in weeks they were paid overtime). Section 778.322 echoes this principle. In pertinent part, 778.322 provides as follows:

> ... in overtime weeks the Administrator has the duty to insure the payment of at least one and one-half times the employee's regular rate of pay for hours worked in excess of 40 and this overtime compensation cannot be said to have been paid until all straight time compensation due the employee under the statute or his employment contract has been paid.

An example, also taken from § 778.322, may further illustrate this principle. If an em-

---

**16.** Section 553.233 modifies Part 778 as it relates     to § 207(k) employees.

ployer pays an employee a $200 salary for a 35 workweek, the employee's regular rate is $5.71 per hour. Thus, if the employee works 35 hours in a given week, the employer owes the employee $200. However, "if the employee works 41 hours in a particular week, he is owed his salary for 35 hours—$200, 5 hours' pay at $5.71 per hour for the 5 hours between 35 and 40—$28.55, and 1 hours' pay at $8.57 for the 1 hour in excess of 40—$8.57, or a total of $237.12 for the week." 29 C.F.R. § 778.322.

14. The first part of plaintiffs' straight time claim is analogous to the examples in §§ 778.317 and 322. In the examples, the maximum hours standard was 40 hours per week. In the instant case, the maximum hours standard is 171 hours per 28–day period. The employer in the examples paid for only 35 hours although the employee's workweek was 40 hours. Plaintiffs contend that, as in the examples, the State has paid, and is paying, for only 160 hours although their work period was, and is, 171 hours. The examples instruct that, in order to comply with the overtime requirements of the FLSA, the employer first must compensate the employees at their regular rate for the unpaid straight time. Similarly, the first part of plaintiffs' straight time claim is simply that, in order to comply with the overtime requirements of the FLSA, the State first must compensate them at their regular rate for all hours above 160 up to and including 171.

15. Although plaintiffs derive the first part of their claim from §§ 778.315, 317, and 322, they cite to no administrative regulation or interpretation to support the second part of their claim. Indeed, as the court noted in the February 18, 1994, Memorandum and Order, the second part of their claim is contrary not only to the discussion found in 29 C.F.R. § 778.322,[17] but also to a considerable body of additional authority.[18] Plaintiffs base the second part of their claim on language from this court's ruling in *Lamon v. City of Shawnee, Kan.*, 754 F.Supp. 1518 (D.Kan.1991), *rev'd on other grounds*, 972 F.2d 1145 (10th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1414, 122 L.Ed.2d 785 (1993).

16. In *Lamon*, this court addressed the question of straight time compensation under the FLSA. The *Lamon* plaintiffs were law enforcement personnel subject to the § 207(k) partial exemption. They could work 171 hours in a 28–day period before they were entitled to receive overtime compensation. During a 28–day period, each plaintiff worked 20 shifts. Each shift lasted eight and one-half hours, including a one-half hour meal period, with a 24–hour day consisting of three overlapping shifts. For each eight and one-half hour shift, the City of Shawnee paid for eight hours of work, but did not pay for the one-half hour meal period unless it was interrupted by a call to duty. Although the City designated a 207(k) devia-

17. Section 778.322 explains the effect of reducing the fixed workweek—which should be read "work period" according to 29 C.F.R. 553.233—for which a salary is paid. In pertinent part, § 778.322 provides as follows:

If an employee whose maximum hours standard is 40 hours was hired at a salary of $200 for a fixed workweek of 40 hours, his regular rate at the time of hiring was $5 per hour. If his workweek is later reduced to a fixed workweek of 35 hours while his salary remains the same, it is the fact that it now takes him only 35 hours to earn $200, so that he earns his salary at the average rate of $5.71 per hour. His regular rate thus becomes $5.71 per hour; it is no longer $5 an hour. *Overtime pay is due under the Act only for hours worked in excess of 40, not 35, but if the understanding of the parties is that the salary of $200 now covers 35 hours of work and no more, the employee would be owed $5.71 per hour under his employment contract for each hour worked between 35 and 40. He would be owed not less than one and*

*one-half times $5.71 ($8.57) per hour, under the statute, for each hour worked in excess of 40 in the workweek. In weeks in which no overtime is worked only the provisions of section 6 of the Act, requiring the payment of not less than the applicable minimum wage for each hour worked, apply so that the employee's right to $5.71 per hour is enforceable only under his contract.*

18. *Hensley v. MacMillan Bloedel Containers*, 786 F.2d 353, 357 (8th Cir.1986); *Dove v. Coupe*, 759 F.2d 167, 171 (D.C.Cir.1985); *Blankenship v. Thurston Motor Lines, Inc.*, 415 F.2d 1193, 1198 (4th Cir.1969); *United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2d Cir.1960); *Cuevas v. Monroe Street City Club, Inc.*, 752 F.Supp. 1405, 1417 (N.D.Ill.1990); *Marshall v. Sam Dell's Dodge Corp.*, 451 F.Supp. 294, 310–03 (N.D.N.Y.1978); *Travis v. Ray*, 41 F.Supp. 6, 8 (W.D.Ky.1941).

tion, it continued to pay at the overtime rate for all work, excluding uninterrupted meal periods, in excess of 40 hours per week, or 160 hours per 28 days.

17. At trial, the jury found the meal periods compensable. Following trial, this court found that the *Lamon* plaintiffs' meal periods did not exceed 10 hours in any given 28–day period. *See Lamon,* 972 F.2d at 1155 (stating that "[t]he appellate record suggests no basis for doubting the district court's finding that each Plaintiff took no more than ten hours in meal periods within a 28–day period"). Therefore, including their one-half hour meal period, the *Lamon* plaintiffs' regular shifts required them to work, at most, 170 hours per 28–day period. They sued under the FLSA to recover unpaid straight time up to ten hours per period. They sought additional compensation for these hours regardless of whether they also worked overtime during that work period. That is, for periods in which the *Lamon* plaintiffs worked only 160 hours not counting their meal periods (which translates to a maximum of 170 hours worked when meal periods are counted), they asserted a claim analogous to the second part of the straight time claim plaintiffs assert in the instant case.

18. The *Lamon* plaintiffs sought compensation for their unpaid straight time at their overtime rate, whereas, in the instant case, plaintiffs seek compensation at their regular rate. The City argued that the FLSA did not require it to pay plaintiffs their regular rate for hours worked beyond 160 in a 28–day period. *Id.* at 1520. Specifically, the City argued that "unless plaintiffs work 171 hours or more, the 11 hours between 160 and 171 are not compensable under the FLSA." *Id.*

19. This court, noting the FLSA's remedial purpose and the Supreme Court's admonition that the FLSA must be liberally construed,[19] rejected the City's argument and held that the *Lamon* plaintiffs were entitled under the FLSA to be compensated at their regular hourly rate for all hours worked between 160 and 171. *Id.* at 1520 & 1521. More specifically, this court wrote in footnote one as follows:

The court notes defendant's extensive briefing of its argument that there is no express requirement under the FLSA that plaintiffs be paid for the hours between 160 and 171 which are statutorily exempt from the normal requirement that these hours are compensable at an overtime rate. However, the court finds defendant's argument to be unreasonable in view of the remedial purpose of the FLSA. The court finds the requirement that plaintiffs be paid compensation at their regular hourly rate to be implicit in the framework of the FLSA. The court further notes that defendant has conceded that if plaintiffs work more than 171 hours, hours worked between 160 and 171 are compensable at plaintiffs' normal hourly rate. The court finds there to be no principled reason for the requirement that plaintiffs work over 171 hours before they are entitled to be paid for time spent working between 160 and 171 hours.

*Id.* at 1521 n. 1.

20. On appeal, the Tenth Circuit identified as one of the central questions "whether the district court erred in calculating the rate at which Plaintiffs should be compensated for meal periods." *Lamon,* 972 F.2d at 1148.[20] After examining the issues, and specifically referencing this court's discussion in footnote

**19.** In *Tennessee Coal, Iron and R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 597, 64 S.Ct. 698, 703, 88 L.Ed. 949 (1944), the Supreme Court explained as follows:

But these provisions [§§ 7(a), 3(g) and 3(j)], like the other portions of the Fair Labor Standards Act, are remedial and humanitarian in purpose. We are not here dealing with mere chattels or articles of trade but with the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others. Those are the rights that Congress has specially legislated to protect.

Such a statute must not be interpreted or applied in a narrow, grudging, manner.

**20.** More particularly, the Tenth Circuit noted that this question was "raised by Defendant's stated appeal issue no. 3." *Lamon,* 972 F.2d at 1155 n. 12. The Tenth Circuit described defendant's third appeal issue as follows: "whether the district court erred in holding that FLSA required payment to Plaintiffs of their regular rate of pay for nonovertime hours worked." *Id.* at 1148 n. 4.

one,[21] the Tenth Circuit concluded that "the trial court correctly calculated the rate at which Plaintiffs would be compensated for mealtimes." *Id.* at 1159.

21. Plaintiffs' two-part straight time claim is based on their contention that they receive no compensation for hours worked above 160 up to and including 171. In order to determine whether the plaintiffs receive no compensation for these eleven hours, the court must examine the terms of their employment with the State.

22. Although some plaintiffs have a MOA with the State, all are subject to the State Pay Plan.[22] The State Pay Plan is authorized by K.S.A. 75–2938(4) which provides that "[a]fter consultation with the director of the budget and the secretary of administration, the director of personnel services shall prepare a pay plan which shall contain a schedule of salary and wage ranges and steps, and from time to time changes therein." K.A.R. 1–5–4 provides that the salary schedules shall reflect the full time monthly rate, and hourly rate for each monthly rate, for all classes of positions in the classified service. Although K.A.R. 1–5–4 requires the Pay Plan to reflect only monthly and hourly rates, the director routinely prepares and publishes Pay Plans containing annual, monthly, hourly, and overtime schedules.

23. Plaintiffs contend that since K.A.R. 1–5–4 requires the director to prepare a schedule showing the hourly rate for each class of employees, and since the hourly rate in the Pay Plan is the only hourly rate schedule, it must apply to plaintiffs and con-

stitute their regular rate of pay (unadjusted for enhancements) for the purposes of the FLSA. More specifically, plaintiffs contend that the Pay Plan entitles them to receive the monthly rate for the first 160 hours and the hourly rate for hours worked over 160 up to and including 171.

24. Each full-time classified employee must be paid within the salary range adopted for his or her class of employees. K.A.R. 1–5–5(a). K.A.R. 1–5–21 states that "[e]mployees shall be paid on *either* a monthly or hourly salary basis at the option of the appointing authority." (Emphasis added). The evidence is overwhelming that plaintiffs have been appointed on monthly salary bases.

25. Plaintiffs attempt to harmonize their status as monthly salaried employees with their contention that they are entitled to compensation at an hourly rate for up to 11 hours per period by arguing that the Kansas statutes and regulations indicate that the monthly rate from the Pay Plan covers only the monthly multiple of a standard 40–hour workweek. That is, they argue that the Pay Plan provides compensation for only 160 non-overtime hours per period.

26. K.S.A. 75–2938 addresses the State's classified service and assigns various duties regarding the development of the Pay Plan, the classification of jobs, and the assignment of classes to positions on the Pay Plan. Specifically, the Director of the DPS is given the responsibility of preparing the Pay Plan,[23] classifying jobs,[24] and assigning classes to

---

21. Specifically, when discussing this court's decision to compensate plaintiffs at their regular rate for their unpaid straight time, the Tenth Circuit wrote that "[w]e affirm this decision for the reasons expressed in the district court's opinion." *Lamon*, 972 F.2d at 1155. The Tenth Circuit later stated that "as the district court held, even if the City is not required to pay overtime, compensation for meal periods at a rate less than a regular wage would be contrary to FLSA." *Id.*

22. In their brief in support of their proposed findings and conclusions, plaintiffs explain that "[t]he troopers' contracts of employment differ from those of the KBI agents and W & P conservation officers only in that they begin with the MOAs...." Plaintiffs' Brief, filed May 23, 1994 (Doc. 485), at p. 17.

23. K.S.A. 75–2938(4) provides, in pertinent part, that "[a]fter consultation with the director of the budget and the secretary of administration, the director of personnel services shall prepare a pay plan which shall contain a schedule of salary and wage ranges and steps, and from time to time changes therein."

24. K.S.A. 75–2938(1) provides, in pertinent part, that "[e]xcept as otherwise provided in the Kansas civil service act, the director of personnel services, after consultation with the heads of state agencies or persons designated by them, shall assign each position in the classified service to a class according to the duties and responsibilities thereof."

positions on the Plan.[25] Full-time classified employees are assigned to monthly salary positions based upon the monthly rates the market offers employees who perform jobs with similar duties and responsibilities regardless of whether they are subject to standard or deviated schedules. K.S.A. 75–2938 does not direct or require the director to prepare alternate versions of the Pay Plan for employees who work varying schedules. Instead, K.S.A. 75–2938 directs that "a" Pay Plan be created to which "each" class of employees is to be assigned. K.S.A. 75–2938(2) & (4).

27. In K.S.A. 75–5505, a statute under the Article entitled "Payroll Accounting for State Agencies," the Kansas Legislature set forth the State's policy regarding standard and deviated workweeks. Specifically, K.S.A. 75–5505(a) provides as follows:

> It is the policy of the state that a forty-hour workweek shall be the standard workweek of state employees, and all pay rates established for such employees shall be based on a forty-hour workweek, *except that workweeks which deviate from the forty-hour workweek may be established by appointing authorities in order to meet the varying needs of the differing state agencies, and in such cases the pay rates established shall be based on the workweek so established.*

(Emphasis added).

28. The policy set forth in K.S.A. 75–5505(a) is again discussed and further developed in K.A.R. 1–9–1. Throughout the relevant period, K.A.R. 1–9–1 has set forth the mechanism by which agency heads are able to designate deviations from the standard work period.[26]

■ 29. The parties have stipulated that the State designated a deviation from the standard 40–hour workweek for all KHP, W & PD, and KBI plaintiffs.[27]

30. Plaintiffs argue that K.S.A. 75–5505(a) and K.A.R. 1–9–1 require the State to establish new pay rates when it modifies an employee's work schedule. That is, they argue that the monthly rates on the Pay Plan are intended to cover only the standard 40–hour work period and not the additional eleven hours worked by § 207(k) partially exempt employees. The court finds plaintiffs' argument unpersuasive.

31. In *Matter of the Estate of Estes,* 239 Kan. 192, 718 P.2d 298 (1986), the Kansas Supreme Court reviewed the rules it applies when construing Kansas statutes. The Court explained as follows:

> The fundamental rule, to which all others are subordinate, is that the purpose and intent of the legislature governs when that intent can be ascertained from the statute. [Citation omitted]. In construing statutes the legislative intention is to be determined from a general consideration of the entire act. Effect must be given, if possible, to the entire act and every part thereof. To this end, it is the duty of the court

**25.** K.S.A. 75–2938(2) provides, in pertinent part, that "[t]he director of personnel services shall recommend to the governor the assignment, and from time to time the reassignment, of each class to a specified range approved or modified and approved as modified by the governor, the same shall become effective on a date or dates specified by the governor." In furtherance of this task, the director is also required to conduct market-based salary surveys.

**26.** K.A.R. 1–9–1 has been amended several times. However, even its original form allowed deviations from the standard work schedule upon the approval of the Director.

**27.** On pages 17 and 18 of the Pretrial Order, in paragraphs f–g, the parties stipulated that the State designated deviations from the standard workweek for all plaintiffs. At trial, there was evidence to support these stipulations as to the Kansas Highway Patrol and Kansas Bureau of Investigation plaintiffs. Apart from the stipulation in paragraph h, there was no evidence that the State properly designated a deviation for the Wildlife and Parks plaintiffs. Indeed, the evidence seems to indicate the State simply failed to execute a proper deviation for these plaintiffs until October 31, 1991. However, the Wildlife and Parks plaintiffs' stipulation controls. Plaintiffs' attempts to qualify this stipulation at trial are unavailing. Thus, the court is unable to grant them the benefit of the State's apparent administrative oversight.

The court notes that to some extent both sides in this action have found themselves constrained by the breadth of their stipulations. At trial, the State attempted, without success, to avoid the effect of its stipulation as to the foundation of certain exhibits. Pretrial Order, filed December 17, 1993 (Doc. 419), at p. 17 (paragraph d).

to reconcile the different provisions so as to make them consistent, harmonious and sensible. [Citation omitted]. In determining legislative intent, the court may properly look to the purpose to be accomplished, the necessity and effect of the statute, and the effect the statute may have under the various constructions suggested. [Citation omitted].

718 P.2d at 301.

32. Under the terms of their employment, plaintiffs were, and are, full-time classified employees. They were hired at monthly, not hourly, rates. As stated in K.S.A. 75–5505(a), these rates are based on the standard 40–hour workweek except where the employee is subject to a deviated work period. In such cases, their rates are based on their deviated periods. K.S.A. 75–5505(a) and K.A.R. 1–9–1 authorize the State's agencies to designate deviations and, thereby, subject certain classes of employees to deviated work schedules. As K.S.A. 75–5505(a) explicitly indicates, it is designed to allow agencies the flexibility to address their varying needs. It achieves its purpose by granting agencies the ability to place certain classes of employees on non-standard work schedules. To designate a deviation, an agency head need only submit a written statement for the director's approval. K.A.R. 1–9–1. An agency's practical ability to designate a deviation for a particular class of employees would be curtailed, and their ability to address their varying needs burdened, under plaintiffs' interpretation. Moreover, plaintiffs' interpretation of this payroll statute would require the DPS either (1) to prepare a shadow pay plan applicable only to one segment of the State's classified

employees or (2) to violate K.A.R. 1–5–21, which states that employees shall be paid on either a monthly or hourly salary basis, and pay plaintiffs both on a monthly and an hourly salary basis.[28] Instead, the court finds that K.S.A. 75–5505(a) and K.A.R. 1–9–1 enable agencies to request that the monthly salary be based on—that is, compensate—a deviated work period.

■ 33. Plaintiffs are not subject to the standard work period. They are subject to deviated schedules and, pursuant to K.S.A. 75–5505(a) and K.A.R. 1–9–1, their salaries are based on—that is, compensate—all non-overtime hours worked. Since they have stipulated that their respective agencies established deviations under K.A.R. 1–9–1, and since their salaries compensate all nonovertime hours worked, the court finds that they have been paid for every nonovertime hour worked.[29] Consequently, the FLSA is not implicated unless the deviation forced their regular rates below the minimum wage. There is no evidence their regular rates fell below the minimum wage at any time during the relevant period nor do they claim their regular rates fell below the minimum wage.

34. Near the end of their brief in response to the State's closing argument, plaintiffs, for the first time, argue that the State cannot, through K.S.A. 75–5505(a) and K.A.R. 1–9–1 or otherwise, allow an agency to deviate a law enforcement employee's work schedule, but not increase his salary, without running afoul of the FLSA. *See Blanton v. City of Murfreesboro,* 856 F.2d 731, 735 (6th Cir.1988) (discussing § 8 of the 1985 Amendments to the FLSA, Public Law

**28.** Plaintiffs argue that if the State paid its § 207(k) employees at an hourly rate for all hours worked above the standard schedule it would not need to construct a separate pay plan applicable only to 207(k) employees. However, plaintiffs clearly are paid on a monthly, and not an hourly, basis. Plaintiffs second alternative would require the State to pay plaintiffs both on a monthly and an hourly basis. Such a result is contrary to the clear language of K.A.R. 1–5–21.

**29.** In their memoranda, although it is unclear, plaintiffs appear to argue that in order to find for the State, the court must hold that 207(k) allows public employers to work law enforcement em-

ployees up to 11 hours per work period with no pay. The court disagrees.

The court does not hold that the establishment of a § 207(k) regime insulates a state from having to compensate for additional time worked. The court holds, instead, that the plaintiffs' monthly rate compensates them for all non-overtime hours worked up to and including 171. Therefore, plaintiffs have received their regular rate for all straight time hours worked.

Section 778.113 of the Code of Federal Regulations discusses the proper method to calculate a salaried employees' regular rate. Since plaintiffs are § 207(k) partially exempt · employees, § 778.113 is modified by § 553.223.

99–150 and holding that where an employer reduces its employees' regular rates so as to nullify the effect of the FLSA the employer violates § 8); *Professional Firefighters v. City of Clayton,* 759 F.Supp. 1408 (E.D.Mo. 1991) (holding that the City violated § 8 of the 1985 Amendments by reducing its firefighters effective hourly wage, so that their straight time plus scheduled overtime would equal their former annual rates of compensation, in an attempt to circumvent additional overtime liability); *Rhodes v. Bedford County, Tenn.,* 734 F.Supp. 289 (E.D.Tenn.1990) (holding that switch from salary to hourly basis violated 29 U.S.C. § 207); *Craven v. City of Minot, N.D.,* 730 F.Supp. 1511 (D.N.D.1989) (noting that following *Garcia* the City unilaterally revised the pay plan reducing plaintiffs' regular rate of pay so that their straight time pay, plus scheduled overtime, would equal their former annual salary). The cases they cite in support indicate that the FLSA may be implicated where it appears that a public employer reduced its law enforcement employees' regular rate in order to decrease its statutory overtime obligations. Each of the cited cases involves a claim by a class of public employees that their employer violated § 8 of the 1985 Amendments to the FLSA by reducing their regular rate in an effort to decrease its liability for overtime pay. In the instant case, plaintiffs do not assert an analogous claim. Nor does it appear that the issue was tried by consent pursuant to Federal Rule of Civil Procedure 15(b). *See Hardin v. Manitowoc–Forsythe Corp.,* 691 F.2d 449, 456–57 (10th Cir.1982) (discussing Rule 15(b) and stating that "[w]hen the evidence claimed to show that an issue was tried by consent is relevant to an issue already in the case, and there is no indication that the party presenting the evidence intended thereby to raise a new issue, amendment may be denied in the discretion of the trial court"); *Cook v. City of Price, Carbon Cty, Utah,* 566 F.2d 699, 702 (10th Cir.1977) (stating that "[w]hen evidence claimed to show trial of an issue by consent pursuant to Rule 15(b) is relevant to a separate issue already in the case, it would be unjust to the opposing party to consider a new theory of recovery after trial is complete"). *See also* 3 James W. Moore and Richard Freer, *Moore's Federal Practice,* ¶ 15.13[2] at pp. 15–130–32 (2d ed. 1994).

35. Plaintiffs also argue that although they are appointed as monthly salaried employees, they actually are hourly employees. Specifically, they argue that their monthly rate does not qualify as a salary for the purposes of the FLSA. In support, they rely on the test set forth in 29 C.F.R. § 541.118. Section 541.118 is applied to determine whether an employee supposedly employed as an exempt executive is paid on a "salary basis" for the purpose of the regulations. Sections 541.212 and 312 explicitly adopt the "salary basis" test of § 541.118 to determine whether persons are employed in exempt administrative and managerial capacities, respectively. The State argues that the "salary basis" test is irrelevant because plaintiffs are not exempt executive, administrative, or managerial employees. Indeed, the § 213(a)(1) exemption is not now, and never has been, an issue. Furthermore, plaintiffs' § 207(k) partial exemption is based on the nature of their work, not their compensation.

36. Pursuant to § 541.118(a), an employee is paid on a "salary basis" if he regularly receives "a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." Deductions may not be made from the "predetermined amount" "for absences occasioned by the employer or by the operating requirements of the business." 29 C.F.R. § 541.118(a)(1). An employer may make deductions, however, (1) when the employee is absent from work for one full day or more for personal reasons, sickness, or disability, as long as the deduction is made according to a plan, policy, or practice and (2) "in good faith for infractions of safety rules of major significance." § 541.118(a)(2), (3), & (5). Section 541.118(a)(6) provides that "[t]he effect of making a deduction which is not permitted under these interpretations will depend upon the facts of the particular case."

37. Plaintiffs argue that even though they are paid a monthly rate, they are not paid on a "salary basis" because they are subject to quantity-based deductions. They apparently

challenge the State's practice of charging absences against accrued leave or compensatory time.

38. The Department of Labor has recognized that, unlike the private sector, the public sector compensates its employees with systems derived from "principles of public accountability that governmental employees should not be paid for time not worked due to the need to be accountable to the taxpayers for the expenditure of public funds." 57 Fed.Reg. at 37667. As the Department of Labor has explained, "[p]ublic accountability is a broad concept that forms the foundation for many governmental administrative practices, including most public sector pay systems, and is derived from the desires of taxpayers that their government be accountable to them for expenditures from the public treasuries. Public accountability embodies the concept that … public agencies are held to a higher level of responsibility under the public trust that demands effective and efficient use of public funds in order to serve the public interest." *Id.* at 37676. Because of public accountability, public sector employers often are unable "to avoid not paying their employees for hours not worked, thereby necessitating deductions for partial day absences." *Id.* at 37673.[30] The Department of Labor also acknowledged that these principles often are embodied in statutes or regulations "requiring all employees, regardless of how paid, to use accrued leave time or incur a reduction in pay for any absences from work." *Id.* at 37667.

39. The court is mindful that the salary basis test was developed as a means to determine whether a private sector employer may treat an employee as being exempt from the FLSA. *McDonnell v. City of Omaha, Ne-*

braska, 999 F.2d 293, 297 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1188, 127 L.Ed.2d 538 (1994); 57 Fed.Reg. 37666, 37666 (1992). *See also* 29 U.S.C. 213(a)(1) (providing that bona fide executive, administrative, and professional employees are exempt from § 206, except for § 206(d)(1), and § 207); 29 C.F.R. § 541.118 (discussing the test with specific reference to the effect certain elements may have on an employer's ability to claim the "exemption").[31]

■ 40. Assuming, without deciding, § 541.118 is applicable in the instant case,[32] the court finds that, under the facts presented, the policies challenged by plaintiffs do not prevent them from being salaried employees within the meaning of the FLSA. *Cf. Barner v. City of Novato,* 17 F.3d 1256, 1261–62 (9th Cir.1994) (holding that a reduction in paid leave time for partial day absences does not defeat salaried status); *Kuchinskas v. Broward Cty.,* 840 F.Supp. 1548, 1555–56 (S.D.Fla.1993) (holding that reducing leave banks for partial day absences, requiring employees to keep time sheets, basing salary on 2,080 hours per year, *inter alia,* did not negate county employees' status as salaried employees and convert them into hourly employees for the purposes of the FLSA); *Fire Fighters Local 2141 v. City of Alexandria, Va.,* 720 F.Supp. 1230, 1232 (E.D.Va.1989), *aff'd,* 912 F.2d 463 (4th Cir.1990) (holding that docking accrued leave or compensatory time for partial day absences will not defeat salaried status because leave and compensatory time does not constitute salary for the purposes of § 541.118 test) (citing Administrative Letter Rulings: Department of Labor, Wage and Hour Division, July 17, 1987)[33]. *But cf. Benzler v. State of Nevada,*

---

**30.** K.A.R. 1–5–5(b) requires proportional pay whenever an employee works fewer than his or her regularly scheduled hours.

**31.** The Department of Labor explicitly recognized the distinction between public and private sector employment relationships when it revised the "salary basis" test for public employers. 29 C.F.R. § 541.5d.

**32.** Section 541.118(a) provides that if an employee's compensation satisfies certain elements, the "employee will be considered to be paid 'on a salary basis' within the meaning of these regula-

tions." The language does not limit the test to one Part or Subpart of the regulations, but appears to have general application throughout. However, within Part 541, § 541.118 is mentioned specifically where it is applicable. *See, e.g.,* §§ 541.212 & 312. In Part 788, the regulations again discuss salaries, and the inferences to be drawn from incremental reductions in pay, but do not refer to the test set forth at § 541.118. *See, e.g.,* §§ 778.304 & 306.

**33.** *McDonnell,* 999 F.2d at 296–998 (finding persuasive the reasoning of *Fire Fighters Local 2141* ); *Keller v. City of Columbus, Ind.,* 778

804 F.Supp. 1303, 1307 (D.Nev.1992) (stating that docking accrued leave and compensatory time and paying overtime are indications that employees are not salaried).

■ 41. K.A.R. 1–5–21 clearly distinguishes between monthly and hourly rates of pay. It provides that every employee shall be appointed on either a monthly or salary basis. Plaintiffs have been appointed on a monthly salary basis. As a result, each month they receive their base monthly rate from the Pay Plan, adjusted for overtime, shift differential, holiday pay or leave without pay. Absent these adjustments, their checks do not vary from pay period to pay period even though the incongruity between their work and pay periods results in their working different numbers of nonovertime hours from pay period to pay period. After examining the nature of plaintiffs' monthly payments, the court rejects plaintiffs' argument and concludes that the payments are salaries as opposed to hourly wages. As such, they compensate all nonovertime hours worked per pay period.

■ 42. The court acknowledges plaintiffs' reliance on the State's publication of an hourly rate schedule, but is unpersuaded that this schedule somehow establishes them as hourly employees. Prior to the application of the FLSA to the State, plaintiffs' were monthly salaried employees. The FLSA does not require the State to pay plaintiffs on an hourly basis. Indeed, the FLSA regulations indicate that a non-exempt or partially exempt employee's earnings may be determined on a salary basis.[34] Thus, the application of the FLSA did not alter their salaried status. Nor did it require that the State increase their pay or compensate them at the same effective hourly rate as other employees with different job duties and responsibilities who share the same position with plaintiffs on the Pay Plan. *See Ball v. City of Dodge City, Kan.*, 842 F.Supp. 473, 474–75 (D.Kan.1994); *Aaron v. City of Wichita, Kan.*, 797 F.Supp. 898, 903 (D.Kan.1992).

43. That the State has prepared and published an hourly rate schedule based on a standard work schedule does not mean that all employees compensated according to the Plan are also compensated at the regular rate earned by standard schedule non-exempts. As partially exempt employees, plaintiffs work different work schedules than employees subject to the standard schedule. Like full-time classified non-exempts, plaintiffs, as full-time classified partially exempts, are paid monthly salaries. However, since plaintiffs work more nonovertime hours than standard schedule non-exempts, their annualized hourly rate will be lower than that earned by non-exempts who occupy the same position on the Pay Plan. The disparity may be unfair, and the court believes it is, but it is not a violation of the FLSA.

## IV. CONCLUSION

Plaintiffs seek to recover unpaid straight time. Plaintiffs receive monthly salaries which compensate all nonovertime hours worked. They have been compensated at their regular rate for all straight time worked. Their claim to recover for unpaid straight time fails.

**IT IS BY THE COURT THEREFORE ORDERED** that the clerk enter judgment for the State on plaintiffs' claim under the FLSA for unpaid straight time.

---

F.Supp. 1480, 1486 (S.D.Ind.1991) (citing with approval *Fire Fighters Local 2141* ).

**34.** Section 778.109 provides that the FLSA allows employers to pay their employees salaries instead of hourly wages. Similarly, employers are able to pay their 207(k) employees salaries instead of hourly wages. *Kohleim v. Glynn County, Ga.*, 915 F.2d 1473, 1480 (11th Cir. 1990).